# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**ETHEL HURST, et al.,**

               **Plaintiffs,**

       **v.**

**THE SOCIALIST PEOPLE'S LIBYAN ARAB JAMAHIRIYA, et al.,**

            **Defendants.**

</td><td>

**Civil Action 02-02147 (HHK)**

</td></tr>
</table>

## MEMORANDUM OPINION AND ORDER

On December 21, 1988, Pan Am Flight 103 exploded 31,000 feet in the air over Lockerbie, Scotland, killing all 259 passengers on board and eleven people on the ground. Among those killed were U.S. citizens Walter Porter, Roger Eugene Hurst, John Mulroy and Bridget Concannon. Eleven of their family members bring this action,[1] individually and as personal representatives, against the Socialist People's Libyan Arab Jamahiriya, the Jamahiriya Security Organization ("JSO"), and the Libyan Arab Airline ("LAA") (collectively "Libya"), as well as two Libyan intelligence officials.[2] Plaintiffs seek to hold Defendants liable pursuant to the state-sponsored terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"),

---

[1] This action is brought by eleven relatives of these four victims: James Mulroy, brother of John Mulroy and Bridget Concannon; Mary Diamond, mother, and siblings Gwennth Forde, Victoria Porter, Olga Husbands, Vernon Druses, and Randolph Porter of Walter Porter; Ethel Hurst, mother, as well as siblings Spencer Hurst, Mitchell Hurst, and Sharon Hurst Duross of Roger Eugene Hurst.

[2] The individual defendants are Abdel Basset Ali Al-Megrahi and Lahem Khalif Fhimah, both Libyan citizens who were intelligence officials and employees of the LAA. The complaint also names John Does #1–20 who are defined as "employees, agents, and/or representatives of the of the JSO who actively and knowingly participated in Libya's terrorist activities." First Am. Compl. ¶ 17.

28 U.S.C. § 1605(a)(7), for violating the so-called Flatow Amendment, 28 U.S.C. § 1605 note,

the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, and the Anti-Terrorism Act

("ATA"), 18 U.S.C. 2333(a), as well as for intentional infliction of emotional distress and civil

conspiracy.  Before the court are (1) Libya's motion to dismiss; (2) Defendant Al-Megrahi's

motion to dismiss; and (3) Plaintiffs' motion for partial summary judgment against Al-Megrahi.[3]

## I. BACKGROUND

**A.      Lockerbie Bombing**

Following the December 1988 explosion of Pan Am Flight 103 over Lockerbie, the

United States and the United Kingdom indicted Al-Megrahi and Fhimah on charges that they

planned and executed the bombing.  By agreement between the United States, United Kingdom,

and Libya, Al-Megrahi and Fhimah were criminally tried under Scottish law by a panel of three

Scottish judges constituting the High Court of Justiciary at Camp Zeist in The Netherlands.

On January 31, 2001, the Scottish panel unanimously convicted Al-Megrahi of the

murders of all 270 victims for his role in the bombing.  *See* Bonnington Decl., Ex. 3 ¶¶ 89–90

(*Her Majesty's Advocate v. Al-Megrahi,* No. 1475/99 (High Court of Justiciary at Camp Zeist,

Jan. 31. 2001)) (hereafter "HCJ Opinion.")[4]  The investigation following the bombing

determined that the explosion was caused by a portable radio-cassette player packed in a brown

Samsonite suitcase that was smuggled onto the plane.  *Id.* ¶¶ 9, 15.  The explosive device was

constructed with a digital timer specially manufactured for, and purchased by, Libya.  *Id.*  ¶ 44.

---

[3] Fhimah has declined to make an appearance in this action.

[4]  The court acquitted Al-Megrahi's co-defendant, Fhimah, due to "insufficient corroboration."  *Id.*  ¶ 85.

The suitcase was apparently brought to the LAA's facilities in Malta by Libyan agents who arranged to have the suitcase smuggled onto the Pan Am flight. *Id.* ¶ 39.

Based on the evidence presented at his trial, the court concluded that Al-Megrahi traveled to Malta during December 7–9, 1988 and again during December 20–21, 1988. *Id.* ¶ 87. Al-Megrahi was a high-ranking member of the JSO and was "head of airline security" which put him in a position to be aware of security operations at airports where the LAA operated. *Id.* ¶ 88. Based on an identification ("albeit not absolute") by a Maltese shopkeeper, the court concluded that while in Malta Al-Megrahi purchased the clothing that surrounded the explosive device. *Id.* ¶¶ 88–89. The court also determined that Al-Megrahi associated with members of the JSO or Libyan military who purchased the types of timers that were used in the explosive device. *Id.* ¶¶ 88–89.

Applying a "reasonable doubt" standard, the three-judge panel unanimously determined that Al-Megrahi was guilty. *Id.* ¶¶ 89–90. Al-Megrahi's conviction was unanimously affirmed by the Appeal Court of the High Court of Justiciary on March 14, 2002. *See* Bonnington Decl., Ex. 4 (*Appeal against Conviction of Al-Megrahi v. Her Majesty's Advocate v.,* No. 104/01 (Appeal Court, High Court of Justiciary, March 14, 2002)).

On August 15, 2003, the Chargé d'Affaires of the Permanent Mission of Libya to the United Nations issued a statement to the U.N. Security Council that Libya "[h]as facilitated the bringing to justice of the two suspects charged with the bombing of Pan Am 103 and accepts responsibility for the actions of its officials." United Nations Doc. S/2003/818.

**B.      Procedural History**

In 1994 and 1996, the survivors of many victims of the Lockerbie bombing filed suits against Defendants, which were consolidated in one action in the Eastern District of New York (the "New York action").  Among those who filed suit were Siobhan Mulroy, daughter of John Mulroy, individually and as his representative, and Molena Porter, widow of Walter Porter, individually and as his representative.  *See Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 753 (2d Cir. 1998).  Plaintiffs here filed the present complaint in 2002, which was consolidated with the New York action and transferred to the Eastern District of New York.

In 2002, Defendants settled with most of the plaintiffs in the New York action for a total of $2.7 billion, or $10 million per victim, to be paid to the representative of the victim's estate to settle all claims for "compensatory death damages."  *See* Agreement of Proposed Settlement (Oct. 23, 2002) (hereinafter "Agreement").[5]  Plaintiffs in the present action, however, were excluded from that settlement.  The Eastern District of New York determined that they were "not wrongful death beneficiaries under applicable state law" and thus were neither covered by, nor entitled to distribution from, the settlement.  *Rein v. Mulroy*, 2005 WL 1528870, at *1 (2d Cir. June 28, 2005) (affirming conclusion that James Mulroy, Mary Diamond, Gwennth Forde, Victoria Porter, Olga Husbands, Vernon Druses, and Randolph Porter ("the Objectors") were not included in the settlement).  Accordingly, in September 2005, Plaintiffs' claims were remanded to this court.

_____

[5] Plaintiffs submitted copies of the Agreement, as well as the individual settlements with Siobhan Mulroy, Molena Porter, and Bernadette Concannon, daughter and representative of Bridget Concannon.  Pls.' Ltr. of Dec. 16, 2005, Exs. C–F.  Plaintiffs indicated that they did not have a copy of the settlement related to Roger Hurst but represented that it was likely identical to the other releases as Defendants executed identical releases with all claimants.  *Id.* at 2.

Before the court are (1) Libya's motion to dismiss for failure to state a claim, lack of personal jurisdiction, and to dismiss the claim of relief for punitive damages; (2) Defendant Al-Megrahi's motion to dismiss for lack of standing; and (3) Plaintiffs' motion for partial summary judgment against Al-Megrahi.[6]  The court will consider each motion in turn.

---

[6]  A motion to dismiss is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Martin v. Ezeagu*, 816 F.Supp. 20, 23 (D.D.C. 1993) (internal quotations omitted); *see Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (observing that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").  The court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Ben. Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994).  In evaluating a Rule 12(b)(6) motion to dismiss, the court is limited to considering facts alleged in the complaint, any documents either attached to or incorporated in the complaint, matters of which the court may take judicial notice, *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997), and matters of public record, *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Material facts are those "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## II. ANALYSIS

**A.     Libya's Motion to Dismiss**

**1.     The Foreign Sovereign Immunities Act and Flatow Amendment**

Plaintiffs assert causes of action against Libya based on the FSIA and the Flatow

Amendment.  As Libya correctly asserts, neither provision creates a cause of action against a

foreign state.  The FSIA, however, does provide a jurisdictional basis for Plaintiffs to pursue

other causes of action against Libya if they satisfy its requirements.

Although the FSIA generally provides foreign states with immunity from suit in U.S.

courts, it enumerates several exceptions under which a foreign state may be sued.  28 U.S.C.

§§ 1605, 1607.  The so-called "state-sponsored terrorism exception," added in 1996, abrogates a

foreign state's immunity for personal injuries caused by terrorist acts committed by the state's

officials or agents.  28 U.S.C. § 1605(a)(7).[7]  This exception to immunity only applies if (1) a

foreign state defendant has been specifically designated by the U.S. State Department as a "state

sponsor of terrorism" at the time the incident occurred; (2) the foreign state is afforded a

reasonable opportunity to arbitrate any claim based on acts that occurred in that state; and (3)

---

[7]  The FSIA, enacted in 1976, was amended in 1996 as part of the comprehensive
Antiterrorism and Effective Death Penalty Act ("AEDPA"), to provide for the state-sponsored
terrorism exception.  *See* Pub. L. No. 104-132, § 221(a), 110 Stat. 1214 (1996).  The exception
provides jurisdiction for a cause of action

> in which money damages are sought against a foreign state for personal injury or
> death that was caused by an act of torture, extrajudicial killing, aircraft sabotage,
> hostage taking, or the provision of material support or resources . . . for such an
> act if such act or provision of material support is engaged in by an official,
> employee, or agent of such foreign state while acting within the scope of his or her
> office, employment, or agency[.]

28 U.S.C. § 1605(a)(7).

either the victim or the claimant was a U.S. national at the time those acts took place.  *Id.* §

1605(a)(7)(A-B).

Five months after creating the state-sponsored terrorism exception, Congress enacted the

"Flatow Amendment," 28 U.S.C. § 1605 note, in recognition of the family of Alisa Flatow, a

woman who died as the result of a terrorist bombing in Israel in 1995.  *See Flatow v. Islamic*

*Republic of Iran*, 999 F. Supp. 1, 12 (D.D.C. 1998).  The Flatow Amendment provides U.S.

nationals with a private cause of action for terrorism damages against individual officials,

employees, and agents of designated foreign states acting in their personal capacities.  28 U.S.C.

§ 1605 note.[8]

Neither the FSIA nor the Flatow Amendment, "nor the two considered in tandem,"

however, create a cause of action against a foreign state.  *Cicippio-Puleo v. Islamic Republic of*

*Iran,* 353 F.3d 1024, 1033 (D.C. Cir. 2004).  The FSIA state-sponsored terror exception is purely

jurisdictional in that it "merely waives the immunity of a foreign state without creating a cause of

action against it."  *Id.*  And "the Flatow Amendment only provides a private right of action

---

[8]  Specifically, the Flatow Amendment provides:

An official, employee, or agent of a foreign state designated as a state sponsor of
terrorism . . . while acting within the scope of his or her office, employment, or agency
shall be liable to a United States national or the national's legal representative for
personal injury or death caused by acts of that official, employee, or agent for which the
courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28,
United States Code for money damages which may include economic damages, solatium,
pain, and suffering, and punitive damages if the acts were among those described in
section 1605(a)(7).

28 U.S.C. § 1605 note.

against officials, employees, and agents of a foreign state, not against the foreign state itself." *Id.*

Thus, Libya may be not be sued pursuant to the Flatow Amendment or the FSIA alone.

Plaintiffs contend that another provision of the FSIA, § 1606, creates a cause of action

against Libya.  Plaintiffs are wrong.  Section 1606 provides that where foreign states are

otherwise subject to suit under § 1605 and § 1607, they "shall be liable in the same manner and

to the same extent as a private individual under like circumstances."  As the Supreme Court has

made clear, neither § 1606 nor any other section of FSIA alone creates a cause of action against a

foreign state.  *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S.

611, 620 (1983) ("The language and history of the FSIA clearly establish that the Act was not

intended to affect the substantive law determining the liability of a foreign state or

instrumentality, or the attribution of liability among instrumentalities of a foreign state."); *Roeder*

*v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 174 (D.D.C. 2002).

Plaintiffs also assert that Libya should be held liable under the doctrine of respondeat

superior for the acts of its agents.  This position is also unsustainable.  What Plaintiffs suggest is

essentially an end-run around the Flatow Amendment's plain language, which is confined to suits

against individuals.  If Congress had intended to create respondeat superior liability for foreign

states under the Flatow Amendment, it would have said so.  *See Cicippio* 353 F.3d at 1035–36

(rejecting conclusion in *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 231 (D.D.C.

2002) that a foreign state could be sued under the Flatow Amendment and FSIA on the theory of

respondeat superior).

Thus, neither the FSIA alone nor the Flatow Amendment provide a cause of action for

Plaintiffs to sue a foreign state.  The state-sponsored terror exception of the FSIA, however, does

provide subject matter jurisdiction for Plaintiffs to pursue a cause of action against Libya under some other source of law in federal court, if they meet its requirements. *Cicippio-Puleo*, 353 F.3d at 1027. Here, Plaintiffs meet the requirements of § 1605(a)(7). Libya was designated as a sponsor of terrorism at the time of the incident. *See* 31 C.F.R. § 596.201; *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002).[9] All of the victims were U.S. citizens;[10] and Libya does not contend that it has been denied a chance to arbitrate its claims.

As Plaintiffs have properly asserted subject matter jurisdiction pursuant to the state-sponsored terrorist exception to the FSIA, the court must proceed to determine whether they have asserted causes of action under other sources of law that may be properly brought against a foreign state.[11]

---

[9]  After Libya accepted responsibility and agreed to pay $2.7 billion in compensation to the families of the victims of the bombing of Pan Am Flight 103, as well as agreeing to stop its development of nuclear weapons, the United States, in 2006, removed its designation of Libya as a state sponsor of terrorism. *See* U.S. Department of State Press Release, "Rescission of Libya's Designation as a State Sponsor of Terrorism" (May 15, 2006), www.state.gov/r/pa/prs/ps/2006/66244.htm.

[10]  Al-Megrahi contends that Mulroy does not meet the requirements of the exception because he is not a U.S. citizen. Section 1605(a)(7) only requires that the claimant or the victim be a U.S. citizen, not both. *See id.* § 1605(a)(7)(B)(ii) (explaining that a court should "decline to hear a claim" where "neither the claimant nor the victim was a nation of the United States" as defined by immigration laws at the time of the alleged act).

[11]  In their Opposition, Plaintiffs assert for the first time a claim by Mulroy under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, on the grounds that they asserted jurisdiction under the statute in their complaint, and they seek leave to amend if the claim was not sufficiently pleaded. The ATS does not provide jurisdiction over foreign states. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 437–39 (1989) (determining that the FSIA, and not the ATS, "provides the sole basis for obtaining jurisdiction over a foreign state in federal court"); *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 175 (D.D.C. 2005).

2.    **Other Causes of Action against Libya**

A suit against a state sponsor of terrorism pursuant to the FSIA "must identify a particular cause of action arising out of a specific source of law," *Acree v. Republic of Iraq*, 370 F.3d 41, 59 (D.C. Cir. 2004), which may "includ[e] state law," *Cicippio-Puleo,* 353 F.3d at 1036.  As the D.C. Circuit has explained, "generic common law cannot be the source of a federal cause of action.  The shared common law of the states may afford useful guidance as to the rules of decision in a FSIA case where a cause of action arises from some specific and concrete source of law." *Acree,* 370 F.3d at 59.

In this case, Plaintiffs assert claims against Libya for intentional infliction of emotional distress and civil conspiracy to commit wrongful death and intentional infliction of emotional distress and seek damages for economic loss, pain and suffering, and solatium.  Libya contends that Plaintiffs have failed to plead these claims with the requisite particularity required by *Cicippio-Puleo* and *Acree* because they have "failed to identify and assert the law of a particular State on which they intend to rely."  Libya's Mot. to Dismiss at 20.  Libya's argument is without merit.  Libya misconstrues this Circuit's pleading requirements under the FSIA: plaintiffs need not set forth their *choice of law* contentions in their complaint.  *Dammarell v. Islamic Republic of Iran*, 370 F. Supp. 2d 218, 221 (D.D.C. 2005) (noting that the court is "unaware of any law, either in the FSIA setting or out, that would require" plaintiffs to "include the choice of law determination in the Complaint itself").  Under *Cicippio-Puleo* and *Acree*, plaintiffs are required to identify "whether these claims are based in state law (or some other source of law), or whether they arise out of the common law or a particular statute," but they need not specify in the complaint a particular state out of which each claim arises.  *Dammarell*, 370 F. Supp. 2d at 221

(internal quotation marks omitted).  In order to survive a motion to dismiss, a plaintiff must give

a defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Id.*

at 223 (citing *Modderno v. King*, 82 F.3d 1059, 1063 (D.C. Cir. 1996).  She need not specify

every theory under which she might proceed, however.  *See Hanson v. Hoffman*, 628 F.2d 42, 53

(D.C. Cir. 1980) ("The liberal concepts of notice pleading embodied in the Federal Rules do not

require the pleading of legal theories.").  Choice of law is a legal determination that the court will

make under its choice-of-law rules.  *See Jannenga v. Nationwide Life Ins. Co.*, 288 F.2d 169, 171

(D.C. Cir. 1961) (observing that "federal courts will take judicial notice of the law of the several

states . . . whether pleaded or not") (internal quotation marks omitted)); *see also Shah v.

Inter-Continental Hotel Chicago Operating Corp.*, 314 F.3d 278, 282 (7th Cir. 2002) (holding

that plaintiffs are not required to identify the federal or state law in a complaint, which may be

discovered by interrogatories or through briefing); 8 Wright & Miller, Federal Practice and

Procedure 3d. § 1253 (2004).

Here, Plaintiffs have set forth the events that occurred, the location of those events, the

residences of the parties, and the common law causes of action under which they seek relief.

Their allegations constitute a "short and plain statement" required by the federal rules, and no

further notice is required.  *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F.

Supp. 2d 168, 182–83 (D.D.C. 2005) (denying a motion to dismiss where complaint specified

causes of action for false imprisonment, intentional and/or negligent infliction of emotional

distress, assault, battery, loss of consortium and solatium, and loss of prospective inheritance).

Thus, the court concludes that the complaint adequately pleads claims for relief against Libya which arise from the common laws of the applicable states.[12]

### 3.      Personal Jurisdiction

Libya also contends that the complaint should be dismissed because Plaintiffs do not have personal jurisdiction over Libya.  Personal jurisdiction exists over a foreign state where the plaintiff establishes an exception to immunity pursuant to § 1605, and service of process is accomplished pursuant to § 1608.  28 U.S.C. § 1330(b); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d at 89.  Plaintiffs meet the requirements of the state-sponsored terror exception, as discussed above, and they accomplished service of Libya with the original complaint in 2002 through diplomatic channels, pursuant to § 1608(a)(4).  *See* Netburn Decl. of May 31, 2006, ¶ 5.  As Plaintiffs have satisfied both requirements, the court concludes that personal jurisdiction over Libya has been established.

### 4.      Punitive Damages

Libya asserts that it may not be sued for punitive damages because it is a foreign state. Under the FSIA, a foreign state is expressly protected from liability for punitive damages, but an agency or instrumentality thereof, such as a commercial entity, may be held liable for punitive damages.  28 U.S.C. § 1606 (providing that "a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages").  If the core functions of the entity are governmental, it is considered the foreign state itself; if the functions are commercial,

---

[12]  Defendants do not contend that Plaintiffs have insufficiently plead facts that would state a claim for intentional infliction of emotional distress or civil conspiracy under the possible jurisdictions available under choice of law analysis — the law of the location where the event occurred (Scotland), the law of the forum (District of Columbia), or the law of domiciles of Plaintiffs (Florida, New York, Missouri, and St. Vincent, West Indies).

the entity is an agency or instrumentality and not the foreign state itself.  *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148, 153 (D.C. Cir. 1994) (adopting categorical approach to distinction); *Regier v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 103 (D.D.C. 2003) (determining that Iran's Ministry of Information and Security were engaged in core governmental functions and thus were part of the foreign state).

Like Iran's Ministry of Information and Security, the JSO performs core governmental functions for the Libya concerning its security and intelligence and thus shares Libya's immunity from punitive damages.  On this record, however, it is unclear whether the LAA's core functions are commercial or governmental.  *See Transaero,* 30 F.3d at 153 (determining that Bolivian Air Force was part of foreign state).  Thus, at this time, the court declines to decide whether punitive damages may be pursued against the LAA.

**B.**     **Al-Megrahi's Motion to Dismiss**

Defendant Al-Megrahi has moved to dismiss on the principal grounds that (1) he cannot be sued in his personal capacity for claims under the ATA, 18 U.S.C. § 2333(a); and (2) Plaintiffs have no standing to bring their individual claims nor are they statutory beneficiaries entitled to proceeds of their relatives' estates.

**1.**     **The Anti-Terrorism Act**

The ATA generally provides for civil remedies for "any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism or his or her estate, survivors, or heirs."  18 U.S.C. § 2333(a)*.*  Section 2337 provides, however that such actions may not be asserted against "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official

13

capacity or under color of legal authority."  18 U.S.C. § 2337(b); *see also Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 60–61 (D.D.C. 2003) (dismissing claims brought under ATA against Libya, its intelligence service, and individual defendants in their official capacities).  Individuals may be sued under the ATA in their personal capacity, however. *Pugh*, 290 F. Supp. at 61.

Al-Megrahi contends Plaintiffs cannot sue him in his *personal* capacity under the ATA because jurisdiction in this action over Libya is premised on Al-Megrahi acting in his *official* capacity.  Al-Megrahi confuses the distinction between *acting* under official capacity and being *sued* in one's official capacity.  An official may be sued in one's *personal* capacity for actions taken in one's *official* capacity without destroying sovereign immunity.  *Hafer v. Melo*, 502 U.S. 21, 26 (1991) (explaining how state officials may be sued in their personal capacities under 42 U.S.C. § 1983 for violations committed under color of law).  The distinction turns on "the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury."  *Id.*  When an officer is sued in his official capacity, it is usually as a means of suing the sovereign indirectly; where an officer is sued in his personal capacity, it seeks to hold him personally liable.  *See Kentucky v. Graham*, 473 U.S. 159, 165–66  (1985) (explaining the distinction).  Section 2337 was only intended to prevent suits against officers in their official

capacity that are in effect seeking relief against the sovereign.[13]  Here, however, Al-Megrahi is sued personally in order to seek remedies from him, not the foreign state.

Individual defendants sued in their personal capacity are not insulated from suit under the ATA simply because a foreign state endorsed their terrorist acts.  To conclude otherwise would render the ATA a nullity.  *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 2006 WL 2384915, at *7 (D.D.C. May 11, 2006) (concluding the same for the TVPA).  Thus, Al-Megrahi may be sued in his personal capacity.  *See Acree*, 370 F.3d at 59.

### 2.     Standing

Al-Megrahi contends that Plaintiffs do not have standing to bring this action under the TVPA, the ATA, or the Flatow Amendment because they are not the legal representatives of the decedents.  He asserts that these causes of action only contemplate one "death suit" on behalf of the victim of the terrorist attack, and that he already settled that suit with the victims' representatives in the New York action.  Plaintiffs rejoin, however, that they are not bringing this action on the victims' behalf, but rather for their own personal injuries as a result of the bombing.

### a.     The Terror Victims Protection Act

The TVPA, 28 U.S.C. § 1350 note, was added to the Alien Tort Statute in 1992 to authorize a federal statutory cause of action on behalf of victims or their representatives for acts

---

[13]   The legislative history of § 2337 indicates that it was intended merely to clarify that ordinary principles of sovereign immunity, as codified by the FSIA, would apply to foreign states and their instrumentalities.  *See* Debra M. Strauss, *Enlisting the U.S. Courts in a New Front: Dismantling the International Business Holdings of Terrorist Groups Through Federal Statutory and Common-Law Suits*, 38 Vand. J. Transnat'l L. 679, 684 n.16 (2005) (reviewing history).  As the FSIA permits officers to be sued in their personal capacities, even for acts sanctioned by terrorist states, then § 2337 must permit such suits as well.  *See Acree*, 370 F.3d at 59.

of torture or extrajudicial killing.  Pub. L. No. 102-256, 106 Stat. 73 at Historical and Statutory

Notes to 28 U.S.C.A. § 1350; *see also Ford v. Garcia*, 289 F.3d 1283, 1286 (11th Cir. 2002)

(explaining that TVPA was passed following the 1980 torture and murder of three American

nuns and a missionary in El Salvador by forces under two military leaders later sued under

TVPA).  The statute makes foreign individuals liable for money damages for torture or

extrajudicial killings committed "under actual or apparent authority, or color of law."  28 U.S.C.

§ 1350 note.  The language of the TVPA limits recovery to the actual victim of torture, "the

individual's legal representative," or "a claimant in an action for wrongful death."  *Id.*  The

TVPA provides a cause of action for both aliens and U.S. citizens to sue in federal court.  *See* S.

Rep. No. 102-249, p. 4 (1991); H.R. Rep. No. 102-367, p. 86 (1991).

The plain language and the legislative history of the TVPA make clear that standing is

limited to the victim herself or one bringing a claim on behalf of a direct victim.  *See Doe v. Qi*,

349 F. Supp. 2d 1258, 1313 (N.D. Cal. 2004) (reviewing history and concluding that TVPA only

permits suits by or on behalf of victim).  Thus, Plaintiffs are not entitled to recover under the

TVPA for any injuries they sustained as a result of Al-Megrahi's acts.  Moreover, Plaintiffs

would not be entitled to sue Al-Megrahi on behalf of the victims under the TVPA.  First,

Plaintiffs concede that they do not have standing to assert wrongful death on behalf of the

victims.  *See* Pls.' Opp'n at 12.  Second, claims under the TVPA on behalf of the victims appear

to have been covered by the 2002 settlement of the New York action.  *See Rein v. Socialist*

*People's Libyan Arab Jamahiriya*, 995 F. Supp. 325, 331 (E.D.N.Y. 1998) (noting that plaintiffs

asserted claims under TVPA against Al-Megrahi in New York action which was later settled).

Thus, the court dismisses any claim against al-Megrahi under the TVPA.[14]

> **b.**     **The Flatow Amendment and ATA**

Plaintiffs do have standing under both the ATA and the Flatow Amendment, however, to pursue claims against Al-Megrahi for the injuries that Plaintiffs *themselves* suffered as a result of the Lockerbie bombing.

The ATA provides for recovery for personal injury to a U.S. national due to a terrorist act, but "does not specifically require that a plaintiff suffer physical harm prior to filing suit." *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 182 (D.D.C. 2004).  The term "personal injury" may mean "[a]ny invasion of a personal right, including mental suffering," loss of consortium and solatium.  *Id.* (concluding that wife could sue as a "principal victim" even where she could not sue as a survivor); *see also Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005) (concluding that language and purpose of ATA indicates that it was intended to permit suit for non-physical injuries, such as emotional distress and loss of consortium, by family members of victims of acts of international terrorism).[15]

---

[14] As Libya correctly asserts, it cannot be held liable under the TVPA, which only creates a cause of action against individuals, not states.  *See* H.R. Rep. No. 102-367, p. 87 (1992) ("Only 'individuals,' not foreign states, can be sued under the [TVPA]."); S. Rep. No. 102-249, p. 7–8. (1991) (similar).  Although the complaint is not entirely clear on this point, to the extent that it could be read to assert such a claim, such a claim against Libya is impermissible.

[15] As a British citizen, Mulroy may not bring a claim under the ATA personally, but he may bring one as his brother and sister's representative.  *Cf. Biton*, 310 F. Supp. at 181 (recognizing that wife could not recover under ATA if husband not a U.S. national).  Such a claim would be foreclosed, however, by the settlement with Al-Megrahi for the claims relating to his brother's and sister's deaths.

Similarly, the Flatow Amendment provides for a private cause of action for "personal injury" to a U.S. national and permits recovery for "economic damages, solatium, pain, and suffering, and punitive damages if the acts include" state-sponsored terrorism, airplane sabotage, and extrajudicial killing.  28 U.S.C. § 1605 note.  Damages for "solatium" are generally defined as "the mental suffering and anguish of the beneficiaries . . . resulting from the death of the decedent."  25A C.J.S. Death § 187 (2006).  As the death of a loved one due to terrorism or airplane sabotage could cause such mental suffering for several U.S. nationals — and not just the victim's legal representative — the Flatow Amendment necessarily contemplates actions by more than just a decedent's legal representative.  *See, e.g., Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 338 (D.C. Cir. 2003) (explaining that claims for solatium under Flatow Amendment follow Restatement (Second) of Torts § 46 articulation of intentional infliction of emotional distress, which permits recovery for all immediate family members meeting the criteria).  Moreover, the very purpose of the Flatow Amendment — to compensate victims of terrorism — contemplates recovery by family members precisely because "a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families."  *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (concluding that family members of bombing victims could recover for intentional infliction of emotional distress); *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 35 (D.D.C. 2001) ("If the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability." (internal quotation marks omitted)).  Thus, Plaintiffs are entitled to seek recovery for their own injuries under both the Flatow Amendment and the ATA.

18

Al-Megrahi's contention that the claims under the Flatow Amendment and ATA are barred by the 2002 settlement in the New York action is unavailing. The settlement concerned only the injuries to the victims and/or their legal representatives. The Agreement specifically provides that it covers "compensatory death damages" for those entitled to recover "on behalf of the 270 decedents' estates." *See* Agreement at 1. Plaintiffs were not a party to that settlement and their claims for recovery were specifically excluded. *See Rein v. Mulroy*, 2005 WL 1528870, at *1 (2d Cir. June 28, 2005) (concluding Plaintiffs were not entitled to distribution under settlement). Thus, Plaintiffs may proceed against Al-Megrahi under the ATA and the Flatow Amendment for their own injuries.

## C.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs have moved for partial summary judgment against Al-Megrahi on the grounds that he has already been convicted by a court of competent jurisdiction of 270 counts of murder and thus that he should be estopped from denying responsibility for the deaths of the decedents. Under the doctrine of offensive collateral estoppel, or issue preclusion, a defendant may be prevented from relitigating identical issues that the defendant litigated and lost against another plaintiff. *Jack Faucett Associates, Inc. v. AT&T*, 744 F.2d 118, 124 (D.C. Cir. 1984) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 222 (1979)). A district court, in its discretion, may only apply preclusive effect to a judgment if (1) the issue was actually litigated, that is, contested by the parties and submitted for determination by the court; (2) the issue was actually and necessarily determined by a court of competent jurisdiction in the first trial; and (3) preclusion in the second action would not work an unfairness. *See id*. at 125. In these circumstances, however, the court must also consider the implications of giving preclusive effect to a foreign

19

judgment, where comity generally precludes recognition unless there has been an opportunity for

a full and fair trial in a foreign court of competent jurisdiction under a system of justice that does

not offend United States public policy. *Hilton v. Guyot*, 159 U.S. 113, 202 (1895); *Tahan v.*

*Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981).[16]

Al-Megrahi contends that his conviction should not be given preclusive effect because (1)

the court should apply the law of the jurisdiction where the judgment was rendered, and the

conviction would not be given preclusive effect in Scottish courts; (2) international comity does

not apply to criminal judgments; and (3) his trial was not fairly conducted.

1.      **Choice of Law**

As a threshold matter, the court must resolve the question of which law to apply in

determining whether to give a foreign conviction preclusive effect.  Ordinarily, a federal court

applies federal law on claim and issue preclusion in non-diversity cases.  *See Blonder-Tongue*

*Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 324 n.12 (1971) (holding that federal courts will

apply their own rule of claim preclusion).  And in determining whether to recognize the judgment

of a foreign nation, federal courts also apply their own standard in federal question cases.  *See*

*Diorinou v. Mezitis*, 237 F.3d 133, 139–40 (2d Cir. 2001); *see also* Restatement (Second)

Conflict of Laws § 98 (1988) cmt. c (observing that in federal question cases, the recognition of

foreign judgments is a matter of federal law).  *But see Alfadda v. Fenn*, 966 F. Supp. 1317, 1329

(S.D.N.Y. 1997) (reviewing conflicting cases and concluding that a federal court should normally

---

[16]  Reciprocity of recognition was once considered a requirement of the *Hilton* standard, but most jurisdictions have abandoned it.  *See* Restatement (Third) of Foreign Relations Law § 481 comment d (1987); *see also Tahan*, 662 F.2d at 867–68 (suggesting that recognition of a judgment in U.S. court was no longer dependant on whether the foreign jurisdiction would recognize a U.S. judgment).

apply either federal or state law, depending on the nature of the claim, to determine the preclusive effect of a foreign country judgment).

Al-Megrahi contends that the court should apply the estoppel rules of the court in which he was adjudicated, and that under Scottish law, a criminal conviction would not have preclusive effect. The authority pertinent to this contention is contradictory: The Restatement states that "a foreign country judgment should ordinarily have no greater effect than it has in the country in which it was rendered," but then goes on to state: "However, no rule prevents a court in the United States from giving greater preclusive effect to a judgment in a foreign state than would be given in the courts of that state." Restatement (Third) Foreign Relations Law § 481, cmt. c. *See also id.* Reporters' Note 3. The majority of U.S. courts, however, have declined to follow the first part of this principle and instead follow domestic rules of preclusion, whether they apply those of the applicable federal or state court. *See* Restatement (Second) Conflict of Laws § 98 (1988) cmt. c. This court agrees with the majority of U.S. courts that have addressed the issue and concludes that it is appropriate to apply federal standards in determining whether to give Al-Megrahi's conviction preclusive effect.

### 2. Preclusive Effect of Foreign Convictions

The remaining question for this court, then, is one of first impression in this circuit: Whether to provide preclusive effect to a foreign criminal judgment in a civil suit. Generally speaking, a "criminal conviction is conclusive proof and operates as an estoppel on the defendants as to the facts supporting the conviction in a subsequent civil action." *Hinton v. Shaw Pittman Potts & Trowbridge*, 257 F. Supp. 2d 96, 100 (D.D.C. 2003) (internal quotations marks

and citation omitted); *see also S.E.C. v. Bilzerian*, 29 F.3d 689, 693 (D.C. Cir. 1994) (precluding

relitigation of facts underlying conviction for securities fraud in subsequent civil case).[17]

Several federal courts have permitted the use of a foreign judgment to estop relitigation of

an issue if the judgment satisfies (1) the *Hilton* requirements for recognition of a foreign

judgment and (2) the requirements for collateral estoppel.  *See, e.g, Diorinou*, 237 F.3d at 140

(applying *Hilton* and concluding that Greek ruling on custody was conclusive as to facts

concerning controversy); *Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 361 (10th Cir.

1996) (applying *Hilton* and collateral estoppel to conclude that Australian judgment resolved

factual issues against plaintiff and barred the claim); *Pony Express Records, Inc. v. Springsteen*,

163 F. Supp. 2d 465, 473 (D. N.J. 2001) (determining that a United Kingdom judgment was

"conclusive as to the issues tried upon the merits therein" because it satisfied the requirements of

collateral estoppel and *Hilton*).   Fewer courts have had occasion to determine whether a foreign

conviction is conclusive evidence of the fact determined therein.  *See, e.g., Cooley v.*

*Weinberger*, 518 F.2d 1151, 1154 (10th Cir. 1975) (holding that a woman's conviction in Iran of

the willful homicide of her husband was sufficient to establish that she should be precluded from

recovering social security benefits); *Alfadda v. Fenn*, 966 F. Supp. 1317, 1332 (S.D.N.Y. 1997)

(giving preclusive effect to French convictions on securities fraud and conspiracy claims).

---

[17]  Al-Megrahi contends that foreign criminal judgments are not given preclusive effect in
U.S. courts.  In support of his contention, however, he cites authority for the proposition that
foreign nations are not required to *enforce* the penal laws of other countries.  *See* Lara A. Ballard,
Note, *The Recognition and Enforcement of International Criminal Court Judgments in U.S.
Courts*, 29 Colum. Hum. Rts. L. Rev. 143, 172 (1997) (observing that the "general rule of
international law is that, in the absence of a treaty, sovereign states are not obligated to enforce
each other's penal judgments").  However, Plaintiffs do not seek to enforce a judgment here;
rather, they seek to estop Al-Megrahi's denial of certain facts that have been litigated and
established elsewhere.

Although the D.C. Circuit has not reached the precise question of whether issue preclusion doctrine is applicable in a civil suit based on a foreign criminal judgment, it has applied a variant of the doctrine based on a foreign conviction in an administrative proceeding. *Donnelly v. FAA*, 411 F.3d 267, 271 (D.C. Cir. 2005).  In *Donnelly*, the Federal Aviation Administration revoked an airman's certification based on his conviction in Japan for attempting to import a controlled substance.  *Id.* at 269.  In determining that the conviction provided "substantial evidence" supporting the FAA's administrative revocation, the D.C. Circuit observed that "principles of comity suggest that [a foreign] judgment should be given weight as *prima facie* evidence of the facts underlying it."  *Id.* at 271.  The court reasoned that the principles of *Hilton* and *Tahan*, while not directly on point — in that they dealt with the enforcement of a judgment, rather than its collateral use — were "persuasive": specifically, "that the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact if there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction."  *Id.* (quoting *Tahan*, 662 F.2d at 864; *Hilton*, 159 U.S. at 205–06) (internal quotation marks omitted).  The court also observed that the burden falls on the party challenging the admission of such evidence to impeach the validity of the foreign verdict. *Id.*

In *Donnelly*, the D.C. Circuit only approved of the use of a foreign criminal conviction to satisfy the lower standard of substantial evidence, not the higher burden of preponderance of the evidence.  *See Columbia Gas Transmission Corp. v. F.E.R.C.*, 448 F.3d 382, 385 (D.C. Cir. 2006) (explaining that an administrative agency decision is reviewed for "substantial evidence,"

23

which "requires more than a scintilla, but . . . less than a preponderance of the evidence")
(internal quotation marks omitted)).  However, the reasoning of the *Donnelly* decision —
applying the principles of *Hilton* and estoppel — is equally apropos here.  Thus, the court will
proceed to determine whether the judgment meets the requirements for recognition of a foreign
judgment and issue preclusion.

**3.    Preclusive Effect of Al-Megrahi Conviction**

        The standards for issue preclusion and recognition of a foreign judgment share the same
underlying principles and concerns.  The *Hilton* standard permits federal courts to grant comity to
foreign judgments where there has been an opportunity for a full and fair trial in a foreign court
of competent jurisdiction after proper service or voluntary appearance by the defendant and under
a judicial system which does not violate U.S. public policy.  *Tahan*, 622 F.2d at 864.  Collateral
estoppel permits establishment of an issue as long as it has been (1) actually litigated and (2)
necessarily determined by a court of competent jurisdiction in the first trial; (3) and that its use in
the second trial not work an unfairness on the defendant.  *Jack Faucett*, 744 F.2d at 124.  In
applying these overlapping concerns to Al-Megrahi's trial and conviction, the court concludes
that the foreign judgment meets the standards for recognition and preclusion.

        Al-Megrahi was tried by the Scottish High Court in a trial lasting 84 days, in which the
prosecution called 231 witnesses, 132 of whom were cross-examined by counsel for Al-Megrahi
and Fhimah.  In weighing the evidence, the court acknowledged that the identification of Al-
Megrahi by the shopkeeper was "not absolute" and that there were "uncertainties and
qualifications."  HCJ Opinion ¶ 88–89.  Ultimately, however, the three judges concluded that
there was "nothing in the evidence which leaves us with any reasonable doubt as to the guilt of

[Al-Megrahi]." *Id.* Al-Megrahi appealed his conviction to five senior judges of the Scottish

High Court of Justiciary, which heard argument on the appeal from January 23, 2002 to February

14, 2002. Bonnington Decl. ¶ 49; Ex. 4. The court of appeal found that none of the grounds

asserted by Al-Megrahi were well-founded and rejected his appeal in a 200-page opinion issued

on March 14, 2002. *Id.*

Al-Megrahi contends that his conviction should not be granted preclusive effect in this

suit, however, based on his assertions that his trial was unfair and prejudicial.[18] He premises

these assertions almost entirely on the observations of Professor Hans Koechler, "the official UN

observer," Def.'s Opp'n at 10, and Professor Robert Black of the Edinburgh law school, both of

whom observed the proceedings and have publicly raised concerns about the conduct of the trial.

Koechler has pointed to (1) contradictory testimony regarding the time and weather when Al-

Megrahi purchased the clothes in the suitcase in Malta; (2) the possibility that the suitcase was

smuggled aboard the flight in London rather than in Malta; (3) the inconsistency of Fhimah's

acquittal with Al-Megrahi's verdict; and (4) objections to the appeal process, including to the

presence of representatives of the U.S. Department of Justice during proceedings. *See* Def.'s

Opp'n at 11; Ex. J (Koechler's Report). For his part, Black contends that the case presented by

the prosecution was a "very weak circumstantial one, and was further undermined by the

additional prosecution concession that they had not been able to prove how the bomb that

---

[18] Al-Megrahi contends that FSIA discourages issue preclusion, citing *Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 18 (D.D.C. 2001). That decision, however, only indicated that preclusion should not be granted where a default judgment was rendered, because such use of a default would fail the requirements of collateral estoppel — namely, that the party had a full opportunity to litigate the issue. *See id.* at 18–19. As Al-Megrahi fully participated in the original proceeding that convicted him, such concerns are immaterial here.

destroyed Pan Am 103 got into the interline baggage system and onto the aircraft."  Def.'s Opp'n

at 13; Ex. K (*Lockerbie: a Satisfactory Process but a Flawed Result*, 36 Case W. Res. J. Int'l L.

443, 443–44).  Black raised many of the same issues as Koechler, including the (1) the reliability

of the identification by a Maltese shopkeeper of Al-Megrahi as the purchaser of the clothes in the

suitcase; (2) the contradictory evidence over whether there was an unaccompanied bag on the

flight from Malta that could have been the explosive device.  *Id.*

Plaintiffs point out that Koechler, a philosophy professor in Austria, is neither a lawyer

nor an expert on criminal procedure; that he was not the sole U.N. observer at the trial (but,

rather, one of five); and that his report was "neither solicited nor published by the U.N."  Pls.'

Reply in Support of Mot. for Summ. J. (Pls.' Reply) at 25.  They also point to the conclusions of

Professor John P. Grant, an expert on Scottish law who also attended the proceedings, who

explained that Koechler "failed to understand the nature of the adversarial proceedings" and

"failed to appreciate the nature of criminal procedure under Scots law by criticizing the Appeal

Court's failure to re-evaluate the evidence."  *The Lockerbie Trial: A Documentary History,* 280,

434 (2004) (cited by Pls.' Reply at 25).  Plaintiffs are less persuasive in attacking Black's

concerns, dismissing them as "nothing more than a lawyer's argument of innocence," which were

rejected by the Scottish High Court and Court of Appeals.  Pls.' Reply at 26.

The ultimate inquiry, however, is not whether this court or any other court would have

reached the same conclusion as the trial court here, but rather, whether the process was adequate

for purposes of recognition and preclusion by a U.S. court — that is, whether Al-Megrahi was

provided with a fair and impartial trial with an opportunity to litigate the issue of his guilt, and

whether this court is satisfied that these foreign proceedings were sufficiently free from prejudice

to warrant their preclusive effect here.  While both Koechler and Black have raised

inconsistencies in the evidence at trial, such factual disputes are best resolved by a trial court —

in this case, a unanimous three-judge panel whose findings were upheld under appellate review.

None of the issues raised by Koechler and Black suggest that the process itself was unfair, or that

it would be unjust to use the result against Al-Megrahi here.  The system under which Al-

Megrahi was tried was based upon long-standing traditions of international and Scottish law and

was designed pursuant to an agreement with the United States and Libya.  He was given a full

and fair trial in which he litigated the central fact sought to be used against him here — his

central role in the Lockerbie bombing — and it would not be unjust to use his conviction to estop

his denial of that fact.

    With preclusive effect afforded to the facts surrounding Al-Megrahi's responsibility for

the deaths of the 270 victims, Al-Megrahi is unable to provide evidence that would permit a

reasonable jury to find in his favor.  *See Laningham*, *v. United States Navy*, 813 F.2d at 1242.

Accordingly, the court grants partial summary judgment in favor of Plaintiffs on the issue of

whether Al-Megrahi is responsible for the deaths of Walter Porter, John Mulroy, Bridget

Concannon and Roger Hurst, which resulted from Al-Megrahi's role in the terrorist attack on Pan

Am Flight 103.[19]

--------

[19] Plaintiffs have also moved for partial summary judgment on their claim of intentional infliction of emotional distress on the grounds that Al-Megrahi's conduct was "extreme and outrageous."  Pls.' Mot. For Summ. J. at 35.  While the court has concluded that the conviction establishes the fact of his responsibility, based on federal issue preclusion law, the question of what constitutes intentional infliction is one that must be answered by reference to the applicable state or D.C. law that governs each individual claim.  Accordingly, the court declines to award summary judgment until the parties have had the opportunity to fully brief the choice-of-law issues concerning the substantive claims.

## III. CONCLUSION

For the foregoing reasons, it is this 1ˢᵗ day of February 2077

**ORDERED** that

(1) Libya's motion to dismiss [#24] is **GRANTED** in part with respect to claims against it for punitive damages; and **DENIED** in part with respect to is contentions regarding failure to state a claim and personal jurisdiction;

(2) Al-Megrahi's motion to dismiss [#19] is **GRANTED** in part with respect to claims under the TVPA, and **DENIED** in part with respect to the claims under the Flatow Amendment and the ATA; and

(3) Plaintiffs' motion for partial summary judgment [#20] is **GRANTED** in part as to the liability of Al-Megrahi for the deaths of the 270 victims of the bombing of Pan Am Flight 103 and is **DENIED** in part as to their claims for intentional infliction of emotional distress; and it is further

**ORDERED** that on or before March 1, 2007, the parties shall file a case management report, which shall include a proposed case management plan with deadlines that shall govern the future proceedings in this action.  If the parties are unable to agree, each shall file its own proposed case management plan and deadlines.

Henry H. Kennedy, Jr.
United States District Judge